Philadelphia Chewing Gum Corporation, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Shell Oil Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources and Township of Haverford, Respondents.

National Wood Preservers, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Clifford Rogers and Virginia Rogers, Petitioners *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

444

Argued October 4, 1977, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr., Rogers and Blatt.

*Leonard Dubin,* with him *Jeanne P. Wrobleski, Andrea B. Wapner,* and, of counsel, *Blank, Rome, Klaus & Comisky,* for appellant, Philadelphia Chewing Gum Corporation.

*J. Stokes Adams, III,* with him *Alan V. Vaskas,* and *Hepburn, Ross, Willcox & Putnam,* for appellant, Shell Oil Company.

*Stephen R. Bolden,* with him *Fell, Spalding, Goff & Rubin,* for appellant, National Wood Preservers, Inc.

*James S. Kilpatrick, Jr.,* with him *Haws & Burke,* for appellants, Clifford and Virginia Rogers.

*Dennis M. Coyne,* Assistant Attorney General, for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, May 24, 1978:

At the heart of these consolidated appeals is the following fundamental question: Under what circumstances may the Commonwealth order a landowner or an occupier of land to correct a condition existing on his land which is causing pollution of Commonwealth waters, where such polluting condition was created by the conduct of someone other than the owner or occupier? It is before us by way of an adjudication and order of the Environmental Hearing Board (EHB) which sustained in part and dismissed in part the appeals of Philadelphia Chewing Gum Corporation (Gum), Shell Oil Company (Shell), National Wood Preservers, Inc. (Wood), and Clifford A. and Virginia M. Rogers (Rogers) from orders issued by the Commonwealth of Pennsylvania, Department of Environmental Resources (DER). These four appellants had been ordered, pursuant to Section 316 of The Clean Streams Law,[1] to take corrective measures with regard to what DER determined was a "condition" existing on land either owned or occupied by them. Since our disposition of these appeals is, in part, determined by the differing relationships each appellant has to the condition involved, we shall first examine

---

[1] Act of June 22, 1937, P.L. 1987, *as amended,* added by Section 5 of the Act of August 23, 1965, P.L. 372, *as amended,* 35 P.S. §691.316.

the factual postures of these appellants vis-a-vis the land, the waters and the existing condition. We shall next discuss the construction and applicability of Section 316 of The Clean Streams Law in situations where the landowner or occupier did not create the condition which is resulting in pollution. Finally, we shall review the constitutional challenges raised to Section 316.

## THE LAND

The land involved here is located in Haverford Township, Delaware County, in the area of the intersection of Eagle Road and the Penn Central railroad line. Appellants Rogers and Gum have owned parcels of land in this area since the 1940's. Rogers' property is located on the northwest side of Eagle Road, Gum's property on the southeast side of Eagle Road, across from Rogers' land. The entire Rogers tract is leased, in part to Wood and in part to Shell. Gum's production plant has been operating on its tract since 1947.

On January 10, 1947, Rogers leased the entirety of their tract to Samuel J. Jacoby (Jacoby) and C. David Jacobs (Jacobs), individuals not parties to the instant proceedings.[2] On January 24, 1947, Jacoby and Jacobs assigned said lease to Wood, a corporation at that time controlled by Jacoby. From March 28, 1947 until July, 1963, Jacoby conducted a wood preservative business on this premises. On July 30, 1963, Jacoby sold his entire interest in Wood to the Goldstein family (Goldstein). At this time also, Goldstein took assignment of the lease of the property on which Wood was located. Thereafter, Wood has continued to operate as a wood preservative business, under Goldstein's ownership and control.

---

[2] A petition to join Jacoby as an additional defendant was filed by Shell in October, 1973. However, EHB denied said petition. See In re National Wood Preservers, 64 Pa. D. & C. 2d 78 (1974).

On February 10, 1967, Wood, under Goldstein, released a portion of the above parcel from its leasehold. On that same date, Rogers leased said portion of the parcel to Shell. Shell subsequently built and, at all relevant times thereafter, has operated and maintained a gasoline station on this leased land.

## THE WATERS

The waters of the Commonwealth involved here are the groundwater and certain surface waters in the geographical area discussed above. The pollutant involved is pentachlorophenol mixed with oil which EHB found was "present in the ground water and in Naylors Run, both of which constitute 'waters of the Commonwealth.'" *See* Section 1 of The Clean Streams Law, 35 P.S. §691.1, wherein "Waters of the Commonwealth" is defined.

Naylors Run is a stream which has its source at a point northwest of the land owned by Rogers and leased to Wood and Shell. Naylors Run flows in a general southerly direction along a course which is northeast and east of the Rogers tract. The stream flows southeasterly under Eagle Road via a culvert and continues to flow in a generally southeasterly direction along a course east of the Gum tract.

Pentachlorophenol mixed with oil is present in the groundwater under the surface of appellants' land. EHB found that the pollutant is discharged into Naylors Run in the following manner:

Pentachlorophenol mixed with oil flows, mostly on top of the water table, under the surface of the property of Rogers' and leased, in part to Shell and in part to Wood. This material then flows in a southwesterly direction under Eagle Road. . . . Pentachlorophenol mixed with oil flows, mostly on top of the water table,

under the surface of the property of Gum. This material then infiltrates the storm sewer pipe which is maintained by the Township . . . at points between manhole No. 8 and manhole No. 9. Pentachlorophenol mixed with oil travels in this storm sewer pipe and is discharged to Naylors Run at the terminus of this pipe.

Although EHB found that "it appears that the major amount of pentachlorophenol mixed with oil is pooled under the surface of the property of Rogers' and leased, in part to Shell and in part to Wood," neither the total volume nor the precise dispersion of the pollutant is presently known. Indeed, one of the directives contained in the EHB order which is the subject of the instant appeals requires appellants to perform further well drilling and samplings of the area's groundwater in order to determine more definitely the scope of the pollution problem.

THE CONDITION

In its adjudication, EHB concluded that the "condition" which is present in this case is "the presence of pentachlorophenol mixed with oil" under the surface of appellants' land. EHB found as fact, however, that neither Wood, under the ownership of the Goldstein family, nor Shell, nor Gum had "discharged or permitted the discharge of industrial waste to the waters of the Commonwealth." The questions arise, therefore, as to how and when this "condition" came into existence.

We begin with EHB's finding that "[p]entachlorophenol is a solid organic material which is acidic in nature. It is a fungicide, a herbicide and *a wood preservative*." (Emphasis added.) EHB found that Wood, during its years under Jacoby, utilized pentachlorophenol in the operation of its wood preservative business. As stated by EHB:

During the course of the operation of this business, under Jacoby's ownership, waste liquids were discharged or permitted to be discharged from the surface of the land upon which said business was conducted to the ground water via a well on said premises. The Health Officer of the Township and representatives from the Pennsylvania Department of Health, the predecessor in duties to D.E.R., took enforcement action against Jacoby and/or against said corporation by reason of the discharges of these waste liquids to the ground water.

At one point in the "Discussion" section of its adjudication, EHB characterizes Jacoby as the individual "who was responsible for the creation of the condition. . . ."

The record contains ample evidence all of which seems to lead inescapably to the conclusion that Jacoby's conduct created this condition. Complaints by area residents to township health officials about discoloration of Naylors Run by an oily brownish substance first began prior to 1956. Jacoby was contacted by both township and state officials regarding these complaints. There is testimony in the record which indicates that Jacoby discontinued the use of the disposal well in 1956. Given the specific findings of fact that neither Wood, under Goldstein, nor Gum nor Shell has discharged any industrial waste into Commonwealth waters, we must conclude that the presence of pentachlorophenol under the land of these appellants is a direct result of Jacoby's activities prior to and including the year 1956. Given EHB's findings of fact pertaining to the subsurface divides and groundwater flow in this area, it appears that Gum "acquired" the presence of pentachlorophenol under its land due to the downward slope of the subsurface water table from the site of the disposal well.

Thus, the "condition" which EHB has ordered these appellants to correct was created by conduct which appears to have ceased over two decades ago. While the conduct has ended, the condition lingers on. Moreover, the very conduct resulting in the condition's creation was not performed by any of these appellants.

### The Applicability of Section 316 to Nonmining Activities

Before discussing the proper application of Section 316 to situations where the conduct of an individual other than the owner or occupier created the condition causing pollution, we shall address the applicability of this section to nonmining activities.

During the proceedings below, it was stipulated by each of the parties that the sole authority for the issuance of the orders by DER was Section 316 of The Clean Streams Law. On appeal to this Court, each appellant has argued that Section 316 applies only to pollution resulting from mining operations—specifically, to acid mine drainage. We are of the view, however, that Section 316 is applicable to the type of pollution and condition present here.

The general legislative history of The Clean Streams Law has been examined by this Court and by the Supreme Court on several occasions, and need not be recounted extensively here. *See Commonwealth v. Barnes & Tucker Co. (Barnes & Tucker I)*, 455 Pa. 392, 395-400, 319 A.2d 871, 873-76 (1974); *Commonwealth v. Harmar Coal Co. (Harmar Coal)*, 452 Pa. 77, 83-86, 306 A.2d 308, 312-13 (1973); *Commonwealth v. Barnes & Tucker Co.*, 9 Pa. Commonwealth Ct. 1, 24-46, 303 A.2d 544, 555-66 (1973), *rev'd, Barnes & Tucker I, supra.* Originally enacted in 1937, The Clean Streams Law thrice has been significantly amended, first in 1945, then in 1965, and again in

1970.[3]   Section 316 was added as part of the 1965 amendments.

As enacted in 1965, Section 316 provided the following:

> Whenever the Sanitary Water Board finds that pollution of waters of the Commonwealth is resulting from a condition which exists on land in the Commonwealth and that the owner or occupier of such land has refused to allow a mine operator or other person or an appropriate agency of the Commonwealth access to the land to take whatever measures are necessary to eliminate the pollution, the board may order the landowner or occupier to allow such access.

Appellants argue that the 1965 amendments to The Clean Streams Law were for the purpose of extending the scope of the statute to pollution resulting from mining activities, a type of pollution theretofore given "special" status under The Clean Streams Law. *See* Section 2 of the Act of August 23, 1965, P.L. 372. Moreover, it is argued that since Section 316 was added concurrent to the addition of Section 315, 35 P.S. §691.315, a section which indisputably applies to mining operations, Section 316 similarly was intended to be limited in applicability to conditions created by mining activities.

Although the 1965 amendments to The Clean Streams Law do appear to have been directed mainly to problems arising from mine drainage, we believe that the legislative changes made to The Clean Streams Law by the 1970 amendments to this statute make the section applicable to the instant condition and pollution.   Our Supreme Court has commented upon the 1970 amendments to Section 316:

---

[3] The Clean Streams Law was also amended in 1956 when Section 314, 35 P.S. §691.314, was added.

Section 316, which had been added in 1965 to require landowners and occupiers to allow access to the land so that appropriate corrective measures could be taken, was *significantly changed* [in 1970]. That section now provides a separate basis for the imposition of liability for pollution 'from a condition which exists on the land.' (Emphasis added.)

*Barnes & Tucker I, supra* at 400, 319 A.2d at 876.

As amended in 1970, Section 316 presently provides, in pertinent part:

Whenever the Sanitary Water Board finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the board may order the landowner or occupier to correct the condition in a manner satisfactory to the board or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action. For the purpose of this section, 'landowner' includes any person holding title to or having a proprietary interest in either surface or subsurface rights.[4]

Several points must be noted with regard to the 1970 amendments to The Clean Streams Law generally, and Section 316 particularly.

Section 4 of The Clean Streams Law, presently entitled "Declaration of Policy" and added in 1965, was amended in 1970 to delete the specific references to mine drainage which had originally been contained therein. *See and compare* Section 2 of the Act of August 23, 1965, P.L. 372 with Section 3 of the Act of July 31, 1970, P.L. 653. We view the legislature's

---

[4] The Sanitary Water Board was abolished and its functions transferred to the Department of Environmental Resources by Section 30(a) of the Act of December 3, 1970, P.L. 834.

deletion of specific references to mine drainage in Section 4 of The Clean Streams Law in 1970 as an indication that the legislative declaration of policy underlying The Clean Streams Law was being correspondingly broadened.

With specific reference to Section 316, it must be observed first, that the 1965 version provided that the Board could only order a landowner or occupier *to allow access* to the land on which a polluting condition was found to exist. In 1970, the provisions of Section 316 were fundamentally altered. DER is now empowered to order a landowner or occupier *to correct* the polluting condition. No longer is this section a mere key to the door; it is a framework itself through which pollution of Commonwealth waters can be combatted.

A second significant change which altered the scope of Section 316 in 1970 was the addition of the words "or a danger of pollution." While previously the Board could act only after pollution was found to exist, action can now be taken at an earlier stage when the *danger* of pollution becomes apparent.

Thus, we believe that the 1970 amendments to Section 316 make that section applicable not only to conditions arising from mine drainage, but, more broadly, to the type of condition causing pollution in this case.

THE APPLICATION OF SECTION 316 TO LANDOWERS OR OCCUPIERS WHO DID NOT CREATE THE POLLUTING CONDITION

EHB applied the provisions of Section 316 to appellants utilizing the following reasoning:

We have found that pollution is resulting from a condition which exists on land which is owned and/or occupied by Appellants.

This finding, standing alone, imposes upon these Appellants the responsibility to correct such condition, notwithstanding the fact that

this condition was neither created nor actively maintained by any of them.

As applied to these Appellants, Section 316 is a declaration of their strict liability to correct a condition based upon the mere fact that they own and/or occupy the land under which this condition exists.

Since we believe that serious constitutional problems arise if the police power of this Commonwealth can be wielded against landowners or occupiers whose ownership or occupancy bears absolutely no relationship to the polluting condition, we hold that EHB committed an error of law in concluding that Section 316 is a declaration of strict liability based upon the mere fact of ownership or occupancy.

In enacting The Clean Streams Law in 1937, the legislature gave statutory expression to an inherent police power of the Commonwealth. "The police power is the inherent power of a body politic to enact and enforce laws for the promotion of the general welfare." *Commonwealth v. Barnes & Tucker Co. (Barnes & Tucker II)*, 472 Pa. 115, 123, 371 A.2d 461, 465 (1977). Nearly thirty years prior to the passage of The Clean Streams Law, our Supreme Court, adopting the language of our Superior Court, stated the following with regard to the police power of the Commonwealth:

That power undoubtedly extends to all regulations affecting the health, good order, morals, peace and safety, of society. . . . That the preservation of the waters of the state from pollution, involving danger to health, is a proper subject for the exercise of the police power, cannot be seriously questioned.

*Commonwealth v. Emmers*, 221 Pa. 298, 306, 70 A. 762, 766 (1908).

More recently, in a case involving Section 315 of The Clean Streams Law, the Supreme Court stated:

A State in the exercise of its police power may, within constitutional limitations, not only suppress what is offensive, disorderly or unsanitary, but enact regulations to promote the public health, morals or safety and the general well-being of the community. Bacon v. Walker, 204 U.S. 311 (1907). This power has been used to prevent industrial practices in the use of private property which were injurious to the public. The Slaughter House Cases, 83 U.S. 36 (1872). The police power may even be exercised over property and current business operations, requiring the destruction of existing property, Miller v. Schoene, 276 U.S. 272 (1928), or the imposition of new costs, Queenside Hills Realty Co., Inc. v. Saxl, 328 U.S. 80 (1946); The Slaughter House Cases, 83 U.S. 36 (1872). Regulations maintaining the State's water resources have also been held to be within the scope of the police power. Hudson County Water Co. v. McCarter, 209 U.S. 349 (1908); Commonwealth v. Emmers, 33 Pa. Superior Ct. 151 (1907), aff'd, 221 Pa. 298, 70 A. 762 (1908).

*Harmar Coal, supra* at 92, 306 A.2d at 316-17.

It has been stated that "[t]he police power of the state is as comprehensive as the demands of society require under the circumstances." *Barnes & Tucker II, supra* at 127, 371 A.2d at 467. Yet, while the scope of the police power is extensive, it is not infinite. There exist certain constitutional standards by which the State's exercise of police power must be measured. Our Supreme Court has deemed "instructive" the standard enunciated by the United States Supreme Court in *Lawton v. Steele*, 152 U.S. 133 (1894):

'To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . .

require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.' Id. at 137.

*Barnes & Tucker I, supra* at 418, 319 A.2d at 885. "In applying these standards a regulation must be measured by its 'reasonableness,' Goldblatt v. Hempstead, 369 U.S. 590 (1962)." *Harmar Coal, supra* at 93, 306 A.2d at 317. "The exercise of the police power is . . . restricted by the parameters of reason." *Barnes & Tucker I, supra* at 419, 319 A.2d at 886.

"Reasonableness" as a standard by which to measure the exercise of police power is not a concept capable of neat definition. In the case of *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 355 (1908), Mr. Justice OLIVER WENDELL HOLMES stated:

All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. The limits set to property by other public interests present themselves as a branch of what is called the police power of the state. The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side. For instance, the police power may limit the height of buildings in a city without compensation. To that extent it cuts down what otherwise would be the rights of property. But if it should attempt to limit the height so far as to make an ordinary building lot wholly useless,

the rights of property would prevail over the other public interest, and the police power would fail. To set such a limit would need compensation and the power of eminent domain.

Our Supreme Court has recognized that "[t]here is often a thin line separating that which constitutes a valid exercise of the police power and that which constitutes a taking." *Barnes & Tucker 1, supra* at 418; 319 A.2d at 885. It is clear, however, that an exercise of police power becomes unreasonable if the regulations imposed by the state become so onerous as to constitute a taking of property which constitutionally requires compensation. *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 594 (1962).

The police power of this Commonwealth may not be used to require a landowner "to abate a public nuisance existing on his land where such ownership is unrelated to the forces or conditions resulting in a public nuisance." *Commonwealth v. Barnes & Tucker Co.*, 23 Pa. Commonwealth Ct. 496, 509, 353 A.2d 471, 478 (1976), *aff'd* 472 Pa. 115, 371 A.2d 461 (1977); *Commonwealth v. Wyeth Laboratories*, 12 Pa. Commonwealth Ct. 227, 315 A.2d 648 (1974).[5] The police

---

[5] We recognize that no express language appears in Section 316 which declares a "condition" resulting in pollution to be a public nuisance. We recognize further that other sections of The Clean Streams Law do expressly declare certain activities to be public nuisances. Present in this case, however, and that process which DER seeks to have stopped, is the discharge of this pollutant into Naylors Run. Section 3 of The Clean Streams Law, 35 P.S. §691.3, expressly declares such a discharge to be a public nuisance. Thus, we deem it proper to apply public nuisance law to this factual situation where the condition is the direct cause of a public nuisance. Moreover, the Supreme Court has stated that "[a] thing may be a public nuisance because it is so declared by statute, either explicitly or implicitly." *Commonwealth v. MacDonald*, 464 Pa. 435, 458, 347 A.2d 290, 303 (1975) (footnotes omitted). We believe that the condition here constitutes an implicitly declared statutory public nuisance.

power of the Commonwealth *may* be brought to bear upon a landowner, however, at least under the theory of common law public nuisance, notwithstanding "[t]he absence of facts supporting concepts of negligence, foreseeability or unlawful conduct." *Barnes & Tucker I, supra* at 414, 319 A.2d at 883.

Applying these legal principles to the facts of this case, we believe that requiring these appellants to spend the financial sums necessary to abate this condition, *based solely upon their ownership or occupancy of land,* would be to employ means unduly oppressive upon these individuals. We believe that such an exercise of police power would transcend "the parameters of reason." We believe that EHB's conclusion that Section 316 is a declaration of the strict liability of these appellants to correct the condition is erroneous as a matter of law because such a construction of Section 316 would permit the Commonwealth to engage in regulation which constitutes the taking of property without compensation, and hence, would be an unconstitutional exercise of police power.

It is the duty of a court, when faced with a construction of a statute involving serious constitutional difficulties, to reject that interpretation in favor of another construction which will save its constitutionality. 2A J. Sutherland, Statutes and Statutory Construction §45.11 (4th ed. C. Sands 1973). "Where a statute can be given two constructions, one of which will render it constitutional and the other unconstitutional, the former construction must be invoked. Dolan v. Linton's Lunch, 397 Pa. 114, 152 A.2d 887 (1959); Evans v. West Norriton Twp. Municipal Authority, 370 Pa. 150, 87 A.2d 474 (1952); Fidelity Philadelphia Trust Co. v. Hines, 337 Pa. 48, 10 A.2d 553 (1940)." *Pittsburgh Coal Co. v. Sanitary Water Board,* 4 Pa. Commonwealth Ct. 407, 424-25, 286 A.2d 459, 468 (1972), *rev'd on other grounds,* 452 Pa. 77,

306 A.2d 308 (1973). *See also Commonwealth v. Mac-Donald, supra* at 447, 347 A.2d at 297.

We believe that there is a construction of Section 316 which both comports with the law of public nuisance and renders that section constitutional as applied to the factual situation present in this case.[6] Where the polluting condition is created by the conduct of an individual other than the owner or occupier, the owner or occupier of the land on which the condition exists cannot be liable to take corrective measures under Section 316 on the basis of the bare fact of ownership or occupancy. Such an owner or occupier can be ordered to take corrective measures, however, if he permitted or authorized the creation of the condition on his land. Such an owner or occupier can also be ordered to take corrective measures if he (1) knows or should know of the existence of the condition on the land; and (2) associates himself in some positive respect, beyond mere ownership or occupancy, with the condition after its creation. The key to imposing liability under Section 316 upon an owner or occupier for the correction of a condition which he did not create is that such an owner or occupier, after knowing of the condition, engages in some affirmative conduct indicating his adoption of the condition. Essentially, this theory of liability for owners or occupiers who do not create the condition is an application to Section 316 of the common law liability of owners or occupiers who "continue" or

---

[6] We are mindful of the Supreme Court's pronouncement that "[t]he remedies provided in Section 316 are statutorily created, and as such are to be strictly construed." *Barnes & Tucker I, supra* at 407, 319 A.2d at 880. It is clear, however, from the context of the above quotation, that the Court was addressing the point that *administrative procedures* must be strictly followed by DER before the remedies provided in Section 316 can be utilized. We do not believe that the Court intended to suggest that the substantive provisions of Section 316 could not be subjected to judicial construction.

"adopt" a nuisance not created by them. *See* 66 C.J.S. *Nuisances* §§83-89 (1950); 58 Am. Jur. 2d *Nuisances* §§48-56 (1971).

We turn now to applying the above construction of Section 316 to appellants in this case.

With respect to Gum, we sustain its appeal on the ground that EHB improperly applied Section 316 to it. There is no evidence in the record to indicate that Gum knew of the existence of this condition prior to the institution of these proceedings. Nor is there any reason why Gum, as a landowner adjacent to the land on which the condition was created, ought to have become aware of the presence of pentachlorophenol mixed with oil under its land. Finally, Gum has never engaged in any affirmative conduct which can possibly be viewed as indicating an association with or its adoption of the condition.

With respect to Shell, there is testimony in the record that a Shell representative, prior to entering into the lease with Rogers, was shown the disposal well used by Wood and informed of the past practice of disposing of chemicals into the well. While this testimony tends to establish that Shell possessed knowledge of the underlying pollution problem at the time it became an occupant, we find no evidence that Shell has ever engaged in any affirmative conduct indicating an association with or adoption of the condition. We, therefore, sustain Shell's appeal on the basis that EHB improperly applied Section 316 to it.

With respect to Wood, an examination of the record indicates that its present management, Goldstein, was wary of pollution problems connected with Jacoby's operation of the wood preservative business prior to entering into its agreement to purchase the company in 1963. Approximately one month prior to purchasing Jacoby's stock on July 30, 1963, Harris Goldstein went to the business premises and remained there continuously for that month in order to deter-

mine whether to buy the business. He observed that the equipment used by Jacoby was in poor condition; that the entire operation was being conducted on dirt and not on concrete floors; that oil was being spilled on the ground and that chemicals were improperly stored. Goldstein specifically inquired of Jacoby regarding the existence of any pollution problems and was assured that, although there had been a pollution problem previously, the problem had been remedied. Consequently, Goldstein insisted that the following clause be included in the July 30, 1963 stock purchase agreement: "Jacoby represents and warrants that . . . there is no litigation pending or threatened against National Wood, and there are no administrative proceedings pending or threatened against it by any agency or instrumentality of the federal, state or local governments, except for a charge of stream pollution since cured. . . ."

On September 17, 1963, Jacoby was arrested by the Pennsylvania State Police for polluting. As a result of Jacoby's arrest, Goldstein consulted their attorney about attempting to force Jacoby to buy back the stock of the business. However, Goldstein decided to keep the business and to attempt to take measures to correct the pollution problem. Some measures were in fact taken in 1964, with the approval of the Pennsylvania Sanitary Water Board. On December 31, 1964, Goldstein and Jacoby entered into an agreement whereby Jacoby agreed to give Goldstein a credit of $35,000 in reduction of the purchase price of the stock. One of the premises upon which said reduction was based was Goldstein's claim that Jacoby had breached the clause in the original purchase agreement regarding the absence of a stream pollution problem. As part of the December 31, 1964 agreement also, Goldstein released Jacoby from the warranty in the original agreement that the pollution problem had been cured.

We are of the opinion that the sequence of events set forth above establishes clearly that Goldstein, after knowing of the existence of the condition causing pollution, engaged in affirmative conduct which indicates an adoption of the condition. While Goldstein's cooperation with the Sanitary Water Board in 1964 is commendable, the fact remains that Goldstein, because of the pollution problem, considered and then decided against divesting themselves of the business. After deciding to keep the business, Goldstein was able to get a reduction in its purchase price, in part because of the pollution problem. Since Wood's present management knew of the existence of the condition and engaged in affirmative conduct to associate themselves with it, we hold that it was proper for EHB to conclude that Section 316 applies to Wood.

With respect to Rogers, we hold that Section 316 is applicable to them as well. Rogers have owned their tract since the 1940's and constantly have had industrial and business tenants on their land. While the record presently before us does not reveal when, or even if, Rogers came to have knowledge of the pollution problem created by one of their tenants, we believe that Rogers should have known of the existence of this condition on their land. Rogers, as owners, have suffered this condition to continue for over twenty years. They have collected rent from Wood for over thirty years, first from Jacoby, the creator of the condition, and subsequently from Goldstein. Thus, we believe that Rogers, over the course of twenty years, have sufficiently associated themselves with the existence of this condition to render reasonable their participation in its abatement.

### ADDITIONAL CONSTITUTIONAL CHALLENGES

Since we sustain the appeals of Gum and Shell on the ground that EHB improperly applied the provisions of Section 316 to them, we need not address the

additional constitutional challenges to that section which they have raised. However, Wood and Rogers have raised several constitutional challenges to Section 316 to which we shall now turn.

Both Wood and Rogers have argued that Section 316 is an unconstitutional violation of due process in that it imposes liability for abatement based upon the mere "status" of landowner or occupier, rather than upon conduct. In light of our above discussion of the proper construction of Section 316, we dismiss these arguments as without merit.

Both Wood and Rogers have argued that DER has violated their right to equal protection because DER has engaged in intentional and purposeful discrimination in the enforcement of Section 316. While it may be true that there are other landowners and occupiers in the area in question under whose land pentachlorophenol mixed with oil is present, but against whom DER chose not to proceed, we do not believe that this conduct constitutes unconstitutional discriminatory enforcement. "Proof of mere laxity of enforcement by the authorities is not sufficient to establish an impermissible exercise of discrimination in the enforcement of the law." *The Kroger Co. v. O'Hara Township*, 243 Pa. Superior Ct. 479, 482, 366 A.2d 254, 256 (1976).

Wood and Rogers argue that EHB's order should be reversed because EHB failed to apply the rule on the burden of proving abatement feasibility enunciated by this Court in *Commonwealth v. Wyeth Laboratories, supra.* In *Wyeth,* a case arising under Section 401 of The Clean Streams Law, 35 P.S. §691.401, we stated that where "the power and resources of the Commonwealth are being brought to bear upon one not affirmatively polluting the environment and *blameless with respect to the conditions producing the pollution* and *simply because of its ownership of the land* alleged to be the source of the pollution" the bur-

den of proving the feasibility of abatement should fall on the Commonwealth. *Wyeth, supra* at 240, 315 A.2d at 655 (emphasis added). As we have stated above, we do not believe that either Wood or Rogers is "blameless" with respect to this condition. More circumstances than mere ownership or occupancy are present here which justify EHB's order directing Wood and Rogers to embark upon an abatement program.

Wood contends that Section 316 is unconstitutional because it constitutes ex post facto legislation. The argument essentially is that Jacoby discharged the pollutant sometime prior to 1963 and Section 316 was not enacted until 1965. We reject this argument because it is the *present condition* of the land which Wood has been ordered to correct. Although the seeds culminating in this condition may have been sewn a number of years ago, the condition itself still persists.

We have considered the remaining arguments raised by Wood and find them to be without merit.

Consistent with the foregoing, we issue an Order.

ORDER

Now, May 24, 1978, the appeals of Philadelphia Chewing Gum Corporation and Shell Oil Company from the adjudication and order of the Environmental Hearing Board dated July 30, 1976, are hereby sustained, and said order, as pertains to said petitioners is hereby reversed. The appeals of National Wood Preservers, Inc. and Clifford A. and Virginia M. Rogers from the adjudication and order of the Environmental Hearing Board dated July 30, 1976, are hereby denied, and said order, as pertains to said petitioners, is hereby affirmed.