621 A.2d 1155

**NORTH CAMBRIA FUEL COMPANY, Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 22, 1992.

Decided Feb. 12, 1993.

Beverly A. Gazza, for petitioner.

Steven Lachman, Asst. Counsel, for respondent.

Stephen C. Braverman, for amicus curiae, Pennsylvania Coal Ass'n.

Before PELLEGRINI and FRIEDMAN, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.

North Cambria Fuel Company (North Cambria) petitions for review of a March 31, 1992 Order of the Environmental Hearing Board (Board) affirming two compliance orders issued by the Department of Environmental Resources (Department) requiring the abatement of discharges from its surface mine site, regardless of whether it was responsible in any way for generating the discharges.

North Cambria is the lessee of a 20.5 acre strip mine site in West Wheatfield Township, Indiana County, known as the Dietrich Mine. It submitted a mine drainage permit application for the site in November of 1981. As part of the application process, North Cambria analyzed water samples from several sites within the proposed permit boundary. Water from two of the sample points were characteristic of acid mine drainage at levels that did not satisfy either the Commonwealth's effluent limits, 25 Pa.Code § 87.102, or federal interim discharge standards, 30 C.F.R. 715.17(a).[1]  With that

1.  Acid mine drainage is polluted water typically caused by coal or clay mining. It is characterized by low pH, high acidity and low alkalinity, and high concentrations of metals, such as aluminum and manganese. Such discharges are unlawful under the Pennsylvania Clean Streams

knowledge, both a mining and a mine drainage permit were issued to North Cambria by the Department on May 3, 1982. Further sampling conducted after receipt of the mine drainage permit but before mine operations began indicated acid mine drainage elsewhere in the permit area.

Mining began in July 1982, and North Cambria completed backfilling the site in April 1983. Water sampling done at the conclusion of the backfilling showed that discharges at three of the sample sites where acid mine drainage discharge had earlier been identified had degraded beyond their pre-mining character. Water samples at these sites continued to degrade, and on June 25, 1985, the Department issued a compliance order citing North Cambria for acid mine drainage discharge flowing from the Dietrich Mine into an unnamed stream. The order directed North Cambria to (1) begin collecting and treating all discharge from the Dietrich Mine so as to achieve compliance with conditions of the permit and the effluent standards of 25 Pa.Code § 87.102, and (2) provide the Department, by August 1, 1985, with a permanent treatment or abatement plan for the discharge. North Cambria appealed the order, arguing in part that it was not the cause of the discharge.

The Department issued a second order to North Cambria on February 4, 1986, citing it for failing to submit a treatment plan in accordance with the earlier order, and for a discharge from one of its treatment ponds built in response to the first order that exceeded maximum allowable effluent limitations. Again, the Department sought compliance with 25 Pa.Code § 87.102. North Cambria appealed this second order as well, and it was consolidated with the prior appeal for a hearing before the Board.

Even though the polluting discharges emanate from its property, North Cambria contended before the Board that it should not be held responsible for abating them because their source is an adjacent surface mine and coal processing plant

Law, Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1–691.702. *Thompson & Phillips Clay Co., infra,* 136 Pa.Commonwealth Ct. at 302, 582 A.2d at 1163.

operated by Blairsville Associates (Blairsville). It contended that fugitive water [2] from the adjacent property migrates to its property, causing the discharge in question. Because it was not responsible for causing the pollution, it contended that the Department's orders imposing liability on it for treating those discharges was improper.[3]

Agreeing with the Department that neither causation nor fault is needed to establish liability, the Board held that Section 315(a) of the Clean Streams Law, 35 P.S. § 691.315(a), imposes liability on a mine permit holder to treat all discharges emanating from its property, even if the ultimate source of the pollution is another active mine. Accordingly, it affirmed the Department's orders directing North Cambria to abate the discharges. This appeal followed.

North Cambria contends that the Board erred, both procedurally and substantively, in imposing liability on it to abate pollution emanating from its property, which it purportedly did not generate. It contends that the Department's:

- orders are contrary to the law of the case because it ignores prior decisions of the Board that shifted the burden to DER once North Cambria showed that Blairsville was a likely source of the pollution. DER was then required to determine whether Blairsville was the source of the pollution, and that Blairsville would be unable to abate the discharges.

- interpretation of Section 315(a) making a mine operator responsible for any polluting discharge, no matter whether the mine operator facilitated the discharge or is associated with it, is an unconstitutional exercise of the Commonwealth's police power.

2. "Fugitive water" is a phrase used to identify mine water entering a particular mine by gravity or under pressure from adjacent mines. *See* *Commonwealth v. Barnes & Tucker,* 472 Pa. 115, 124, 371 A.2d 461, 465 (1974).

3. Between the first and second round of hearings, North Cambria sought to compel the Department to allow it access to the property to conduct discovery. The Board denied North Cambria's motion because the right of entry to other mine sites was limited to the Department and did not extend to its agents.

• even if Section 315 is a proper exercise of the police power, the Department abused its discretion by ordering North Cambria to abate the pollution rather than seeking enforcement against Blairsville.

## I

Two interlocutory orders were issued by the Board, by a single member, prior to the Board's final adjudication. By Opinion and Order dated July 25, 1986, the Board held that if it was shown that the Department, without good cause, was unwilling to cooperate with North Cambria's attempt to perform discovery, that an adverse inference would be drawn that the evidence sought would be unfavorable to the Department. By order dated November 12, 1986, the Board, *inter alia,* held that if North Cambria could show that its belief that Blairsville caused the pollution was a reasonable one, the Department would have the burden of investigating to determine if Blairsville was the source of the pollution, and if it was, whether abatement by Blairsville of the discharge would not be possible.

■ North Cambria contends that the Board's final adjudication ignored these decisions, specifically in finding that the Department did not abuse its discretion in ordering North Cambria to abate the pollution, even though there were alternative remedies. By not considering the inference set forth in the July 25 order or the burden of proof imposed on the parties by the November 12 order, North Cambria contends that it ignored the doctrine of "law of the case". Under "law of the case", a tribunal will not reverse a previous ruling, even if it believes it is erroneous. *See Delaware River Port Authority v. Pennsylvania Public Utility Commission,* 408 Pa. 169, 173, 182 A.2d 682, 684 (1962).

■ Even if the doctrine was applicable to the orders or to administrative orders of this type, the doctrine is not here implicated. Though the issue was hotly contested, the Board made no findings as to who caused the pollution. It assumed, as we do, that Blairsville caused the pollution that emanated

from North Cambria's mine. The reason that it made that assumption was because it found that only the location from where the pollution discharged was relevant, not the source of the pollution. In any event, our subsequent decision in *Thompson & Phillips Clay Co. v. Commonwealth, Department of Transportation*, 136 Pa.Commonwealth Ct. 300, 582 A.2d 1162 (1990), *petition for allowance of appeal denied*, 528 Pa. 640, 598 A.2d 996 (1991), vitiated any application of "law of the case" to the Board's ultimate decision because of clarification of the responsibilities of mine owners for discharges they did not cause.

## II

■ Section 315(a) of the Clean Streams Law regulates the operation of mines, as well as discharges from them into the waters of the Commonwealth.[4]  In relevant part, this provision provides:

> No person or municipality shall operate a mine or allow a discharge from a mine into the waters of the Commonwealth unless such operation or discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department.  Operation of a mine shall include preparatory work in connection with the opening or reopening of a mine, refuse disposal, backfilling, sealing, and other closing proce-

---

4. The General Assembly, in enacting the Clean Streams Act, stated in Section 4 of the Act, 35 P.S. § 691.4, its objective:
   (1) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;
   (2) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;
   (3) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted;
   (4) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and
   (5) The achievement of the objective herein set forth requires a comprehensive program of watershed management and control.

dures, and any other work done on land or water in connection with the mine. A discharge from a mine shall include a discharge which occurs after mining operations have ceased ... The operation of any mine or the allowing of any discharge without a permit or contrary to the terms or conditions of a permit or contrary to the rules and regulations of the department is hereby declared to be a nuisance.

To impose liability under this provision, the courts of this Commonwealth have held that neither fault nor causation is necessary to impose liability. In the seminal case of *Commonwealth v. Harmar Coal Company*, 452 Pa. 77, 306 A.2d 308 (1972), our Supreme Court first addressed what was needed to impose liability on a mine owner under Section 315(a). *Harmar* involved two separate cases consolidated on appeal to our Supreme Court.[5] Two mine operators sought to discharge polluted water migrating from adjacent abandoned mines into its mines without treating them. They reasoned that since they were not responsible for causing the water to become polluted, they were not responsible for abatement, even though the discharge of the polluted waters was necessary for them to continue mining operations. Reversing decisions of this court, the Supreme Court held that a mine operator is responsible for all polluting waters, even though their operation is not the source, stating:

With regard to the purported lack of relationship between the evil sought to be cured and the appellees' conduct, the Commonwealth Court failed to recognize the obvious nexus between the discharging of the acid mine drainage into the surface waters and the clear legislative intent to not only prevent further pollution but also to restore and reclaim those waters presently polluted. As the dissenters below correctly observed, 'it is the discharge of the polluted waters into the stream that is critical and not the source of the polluted waters.' [Citation omitted]. It is even clearer in

5. *Harmar Coal Co. v. Sanitary Water Board,* 4 Pa.Commonwealth Ct. 435, 285 A.2d 898 (1972); *Pittsburgh Coal Co. v. Sanitary Water Board,* 4 Pa.Commonwealth Ct. 407, 286 A.2d 459 (1972).

the language of Section 315(a) of the 1970 Amendments that the Legislature was not concerned with the source of the polluted water for that section provides, in part, that '[n]o person or municipality shall operate a mine or allow a discharge from a mine....'[6]

452 Pa. at 94, 306 A.2d at 318. *See, also, Commonwealth v. Barnes & Tucker Co.,* 455 Pa. 392, 319 A.2d 871 (1974) (*Barnes & Tucker I*); *Commonwealth v. Barnes & Tucker Co.,* 472 Pa. 115, 371 A.2d 461 (1977) (*Barnes & Tucker II*).

In *Thompson & Phillips Clay Co. v. Department of Environmental Resources,* 136 Pa.Commonwealth Ct. at 305, 582 A.2d at 1164–65, which involved an order for a mine operator to treat fugitive water coming from a closed mine, this court commented that in *Harmar,* "the Supreme Court ... squarely faced the issue of whether the source of the polluted waters is critical and the finding of liability under Section 315(a) of the Law, and concluded that the source or origin is irrelevant; the decisive factor is discharge." Directly on point to the case, *Thompson & Phillips* held that no other interpretation was permissible because the plain language of Section 315 does not set forth any requirement that the mine operator "cause" the pollution, only that it "allow" a discharge. If a discharge occurs from a mine operator's property, that is all that is needed to impose liability. More recently, in *Ingram v. Department of Environmental Resources,* 141 Pa.Commonwealth Ct. 324, 336, 595 A.2d 733, 739 (1991), we again reiterated that it is not necessary to establish fault or causation to impose liability, stating:

**6.** In *National Wood Preservers, Inc. v. Commonwealth, Department of Environmental Resources,* 489 Pa. 221, 229, 414 A.2d 37, 41, (1980), *appeal dismissed,* 449 U.S. 803, 101 S.Ct. 47, 66 L.Ed.2d 7 (1980), our Supreme Court noted that such a broad reading of the Act was mandated because it would frustrate the Legislature's fulfillment of its obligation under Article 1, Section 27 of the Pennsylvania Constitution:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

As we held in *Thompson & Phillips*, liability under the Clean Streams Law is not founded in tort, but is based on the police power of the Commonwealth to enact legislation for the protection of the health, safety and welfare of its citizens. It is not necessary to establish a causal link between mining activities and stream pollution for liability to attach under the Clean Streams Law. Israel's liability under Section 315(a) of the Clean Streams Law attached when he allowed discharges from the mine site to enter the Deer Creek tributary, regardless of whether he conducted any mining activities there.

*See, also, William J. McIntire Coal Co. v. Commonwealth, Department of Environmental Resources,* 108 Pa.Commonwealth Ct. 443, 530 A.2d 140 (1987).

North Cambria does not disagree that Section 315 liability can be imposed on a mine operator, notwithstanding that the operator neither was at fault nor the generator of the pollution.[7] Surveying the case law where liability has been imposed on non-generating polluters within the Commonwealth's police powers, North Cambria notes that liability has only been imposed when the mine operator has indirectly caused the discharge by facilitating or associating itself with the discharge in some way, or there is no other method to abate the discharge.[8] It contends that such conditions must exist to impose liability on a non-generating mine operator; otherwise, there is an insufficient nexus between the harm to be abated and the discharge of the polluted waters. Absent such a

---

7.  To the contrary, *Amicus curiae* Pennsylvania Coal Association asks us to overrule our decision in *Thompson & Phillips* and *Ingram*. We are not inclined to do so.

8.  North Cambria's survey of the case found that mine operators were found liable in the following situations: *Harmar Coal Co.* (pumping of water from abandoned mines in connection with the operation of its working mine); *Barnes & Tucker I* (required treatment from mine operators closed mine that may have included acid mine drainage which originated in an adjacent closed mine); *Barnes & Tucker II* (operator's post-mining activities created the discharge of the polluted waters); *McIntire Coal Co.* (mine operator increased the pollution from another mine by violating the special conditions imposed on his permit); *Thompson & Phillips* (pollution came from an adjacent closed mine).

nexus, North Cambria reasons that imposition of Section 315 liability is an impermissible exercise of police power, and so burdensome that it is tantamount to a taking in violation of Article I, Section 10 of the Pennsylvania Constitution,[9] as well as the 14th Amendment to the United States Constitution.

The police power has been defined as "the inherent power of the body politic to enact and enforce laws for the promotion of the general welfare." *Barnes & Tucker II*, 472 Pa. at 123, 371 A.2d at 465. The police power of the Commonwealth is:

> fundamental because it enables 'civil society' to respond in an appropriate and effective fashion to changing political, economic, and social circumstances, and thus to maintain its vitality and order ... 'The police power of the state [must therefore be] ... as comprehensive as the demands of society require under the circumstances.'

*National Wood Preservers*, 489 Pa. at 232, 414 A.2d at 42 (1980) (quoting *Barnes & Tucker II*, 472 Pa. at 126, 371 A.2d at 467). Legislation protecting state water resources is a proper exercise of the police power, even if it imposes additional costs on property owners. *Commonwealth v. Emmers*, 221 Pa. 298, 70 A. 762 (1908); *National Wood Preservers*, 489 Pa. at 233, 414 A.2d at 43.

The extent of the police power, however, does not mean that there are no boundaries for its exercise. Use of the police power is "restricted by the parameters of reason." *Barnes & Tucker I*, 455 Pa. at 419, 319 A.2d at 886. To determine whether imposition of an obligation on property owners is an exercise of the state's police powers that is within the "parameters of reason", our Supreme Court has adopted a standard first enunciated by the United States Supreme Court in *Lawton v. Steele*, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894). *See Barnes & Tucker II*, 472 Pa. at 123, 371 A.2d at 465; *National Wood Preservers*, 489 Pa. at 234, 414 A.2d at

---

9. Article I, Section 10 provides in relevant part:
   [No] private property shall be taken or applied to public use without authority of law and without just compensation being first made or secured.

37. That standard sets forth a three-prong test that requires the police power to be exercised reasonably:

    1.  it must be in the interest of the public that it requires such an interference;

    2.  the means are reasonably necessary to accomplish the goal; and

    3.  the means are not unduly oppressive upon individuals.

North Cambria contends that imposition of liability without fault is an impermissible exercise of the police power under the *Lawton* standard because it never facilitated or associated itself with the mine discharge emanating from its property. It maintains that the second prong which requires that the means be reasonable to accomplish the goals of the legislation has not been met, because to impose liability on a mine operator who never associated itself with the pollution is not reasonably necessary to clean the polluted waters of the Commonwealth. The more reasonable option is for the Department to proceed against the generator of the pollution, Blairsville. North Cambria also urges us to find that the third prong has not been met because it is unduly oppressive for the Commonwealth to compel North Cambria to assume the enormous financial burden of perpetual treatment of the discharges, especially when it must treat the discharge created by an adjacent active mine operator.

North Cambria argues that the Department's suggested interpretation of Section 315 would be an unconstitutional exercise of police power, and points to our decision in *Philadelphia Chewing Gum Corp. v. Commonwealth, Department of Environmental Resources*, 35 Pa.Commonwealth Ct. 443, 387 A.2d 142 (1978), *aff'd in part and appeal dismissed in part, sub nom. National Wood Preservers, Inc. v. Commonwealth, Department of Environmental Resources*, 489 Pa. 221, 414 A.2d 37, *appeal dismissed,* 449 U.S. 803, 101 S.Ct. 47, 66 L.Ed.2d 7 (1980). In that case, the Department issued an order under Section 316 of the Clean Streams Law [10] directing

---

**10.** Section 316 of the Clean Streams Law in part provides:
    Whenever the department finds that pollution or a danger of pollution is resulting from a condition which exists on the land in the

Philadelphia Chewing Gum Corp. (Gum), Shell Oil Company (Shell), National Wood Preservers, Inc. (National Wood) and Clifford and Virginia Roger (Rogers) to abate the petrochemical pollution caused by Shell and National Wood on property owned by Rogers, but which eventually flowed downgrade to contaminate the property owned by Gum. Gum engaged in no petrochemical activities or in any way associated itself with the pollution. Overturning the Board's order affirming the Department's order, this court found that to require an owner to abate the pollution "*based solely upon their ownership or occupancy of the land* would be unduly oppressive upon these individuals ... and would transcend 'the parameter of reason.'" 35 Pa.Commonwealth Ct. at 459, 387 A.2d at 150. (Emphasis in original).

This court went on to hold that before Section 316 liability attaches, the owner or occupant must (1) know or should have known of the existence or condition on the land and (2) must associate himself in some positive respect, beyond mere ownership or occupancy, with the condition after its creation. *Id.*, 35 Pa.Commonwealth Ct. at 460, 387 A.2d at 150. Liability may also be incurred if an operator affects a discharge to the extent that his drainage cannot be separated from the fugitive discharge as in *Barnes & Tucker I.*

North Cambria argues to adopt a similar standard to impose Section 315 liability making a mine operator only responsible for abating a discharge when it associates itself with it. Our reasoning set forth in *Philadelphia Chewing Gum*, however, is inapplicable when the fugitive water is flowing to a mine site, albeit closed, but still under bond.[11]

> Commonwealth, the department may order the landowner or occupier to correct the condition in a manner satisfactory to the department or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action. For the purpose of this section, "landowner" includes any person holding title to or having a proprietary interest in either surface or subsurface rights.

11. Before a surface mine operator can commence operations, the operator must post a bond with the Department to ensure that the operator will reclaim the area after mining, as well as to abate polluting mine discharges. The life of the bond is for the life of the mining

Section 315 imposes liability on any mine operator who "allows" polluted waters into waters of the Commonwealth. Unlike *Philadelphia Chewing Gum,* where the non-generating land owner never engaged in any activities that could result in pollution, a mine operator, by the terms of Section 315, assumes an obligation when he gets a mine permit to treat all discharges emanating from its mine until the bond is returned. This result is mandated because the complexity of locating sources of polluted waters would hinder abatement of mine pollution if the defense could always be raised that "it's not coming from our mine." The General Assembly was well within its police power to provide for abatement of the "nuisance" by requiring the operator of the mine from which the discharge flows to abate it.

### III

North Cambria contends that the Department abused its discretion by ordering it and not the generator, Blairsville, to abate the discharge. It contends that there was an abuse of discretion, because Section 610 of the Clean Streams Law, 35 P.S. § 691.610, mandates that where there are alternative remedies available to abate the condition, the Department is required to pursue those remedies prior to seeking abatement from a party that did not cause the pollution. North Cambria then contends that because Blairsville is an active mine and was the cause of the polluting discharge, it was an abuse of discretion for the Department not to first seek enforcement against Blairsville.[12]

Section 610 of the Law, in relevant part, provides:

operation, plus five years from the last vegetation of the site. 52 P.S. § 1396.4(d). Bonds are released if the operator has accomplished the appropriate state of reclamation for the site and where no pollution or potential pollution of the Commonwealth waters exist. 52 P.S. § 1396.-4(j).

12. North Cambria apparently cannot join Blairsville in its appeal of the Department's order to the Environmental Hearing Board. As the Board explained in *Berwind Natural Resources v. Commonwealth, Department of Environmental Resources,* Docket No. EHB 84–130–G (1985):

The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act. ... Provided, however, That an *order affecting an operation not directly related to the condition or violation in question, may be issued only if the department finds that the other enforcement procedures, penalties and remedies available under this act would probably not be adequate to effect prompt or effective correction of the condition or violation.* The department may, in its order, require compliance with such conditions as are necessary to prevent or abate pollution or effect the purposes of this act. (Emphasis added).

As the Department correctly notes, to adopt North Cambria's interpretation would require us to interpret "directly related to the condition or the violation" to mean "directly cause the condition or violation." As we set forth in Part I of this opinion, the courts of this Commonwealth have stated over and over that a Section 315 violation is to "allow" the discharge, and a mine operator is responsible for all discharges emanating from it, notwithstanding that it was neither at fault nor the cause of the discharge. If anything, the use of the word "related" by the General Assembly buttresses that "cause" is not an element in finding liability. Here, the violation in question emanates from North Cambria's mine, and consequently, the Department's abatement order requiring North Cambria to abate the pollution is proper and directly related to the discharge in question.

The Rules of Civil Procedure generally do not apply to proceedings before this Board. *Freeport Area School District v. Commonwealth, Human Relations Commission,* 335 A.2d 873, 18 Pa.Commonwealth Ct. 400 (1975). Instead, the Board is bound by the General Rules of Administrative Practice and Procedure, 1 Pa.Code, Part II, and by 25 Pa.Code, Chapter 21, neither of which provide for compulsory joinder of parties. *Sullivan v. Commonwealth, Insurance Department,* 408 A.2d 1174, 48 Pa.Commonwealth Ct. 11 (1979). Moreover, the Board's jurisdiction is limited to appeals of actions taken by DER, 71 P.S. § 510–21. There is nothing in that grant of jurisdiction which entitles the Board to adjudicate the rights of parties vis a vis each other; the Board could not accept Berwind's proposed complaint against Jandy and Eastern Mining. Correspondingly, Berwind is appearing before the Board in the above-captioned appeal as an appellant, not as a defendant, and therefore, cannot be allowed to propose additional defendants.

Moreover, not only is the Department's order not in violation of Section 610, it is directly authorized by Section 316 of the Law, even as interpreted by *Philadelphia Chewing Gum.* Section 316 authorizes the Department to order a mine operator to abate a condition on land for which it has a permit to mine, because that it is an obligation that naturally follows when engaged in the activity. While this result is harsh, North Cambria can still pursue its civil remedies against Blairsville to seek reimbursement.

Accordingly, because Section 315 is a valid exercise of the Commonwealth's police power and the Department did not abuse its discretion by ordering North Cambria to abate polluting discharges, the Board's decision is affirmed.

## ORDER

AND NOW, this 12th day of February, 1993, the order of the Environmental Hearing Board dated March 31, 1992, at E.H.B. Docket No. 85-2976, is affirmed.