**ADAMS SANITATION COMPANY,**
Petitioner,

v.

**PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 1996.
Decided Oct. 18, 1996.

Robert B. Hoffman, Harrisburg, for Petitioner.

Melanie G. Cook, Assistant Counsel, for Respondent.

Before McGINLEY and PELLEGRINI, JJ., and SILVESTRI, Senior Judge.

SILVESTRI, Senior Judge.

Adams Sanitation Company appeals from an order of the Environmental Hearing Board (Board) which made final its previous order granting partial summary judgment in favor of the Department of Environmental Protection (Department).[1]

The facts are as follows. On July 22, 1977, Adams Sanitation Company (ADSCO), entered into a lease with Netta S. Deatrick to operate a sanitary landfill on an approximately 108 acre site owned by Deatrick in Tyrone Township, Adams County. On February 2, 1979, ADSCO received a permit to dispose of solid waste on the site from the Department. Keystone Sanitation Company Inc., by agreement dated October 22, 1983, acquired ADSCO's assets, name and tradename, as well as the foregoing lease. Keystone assigned the lease to its new wholly owned subsidiary, Adams Sanitation Company (Adams), on November 15, 1983.

Adams began operating the former ADSCO landfill in February of 1984. At the time of Adams takeover, ADSCO had landfilled 78 acres of the 108 acre site. Adams intended to fill the remaining 30 acres of the site, and accordingly, submitted an application to the Department, noting that although the property included 108 acres, it only intended to fill the 30 acres of the site which ADSCO had not filled.

A permit was issued by the Department, and Adams began operations, filling approximately 8.8 acres of the 30 acres covered by the permit. Adams did not deposit any waste in the 78 acre portion of the site which ADSCO had previously filled, (see Pre-hearing stipulations, ¶¶ 6, 9; R.R. 29a). Adams did, however, operate and maintain a leachate collection and treatment system which was installed by ADSCO on this portion of the site, including repairing holes in the liners of the three treatment lagoons which were part of the system. Adams also submitted monthly discharge monitoring reports to the Department regarding the leachate system. In addition to the foregoing activities performed by Adams on the 78 acre portion of the site previously filled by ADSCO, Adams eliminated erosion gullies and performed revegetation work in this area. (Pre-hearing stipulations, ¶¶ 18, 20, 22, 30, 31; R.R. 31–33a).

On August 21, 1990, the Department, by letter, advised Adams that it was responsible for water supply contamination at the Strine residence which was located on a tract of land adjacent to the 78 acre portion of the site previously filled by ADSCO. The letter directed Adams to provide a replacement water supply to the Strine residence. On October 22, 1990, the Department issued another order to Adams, directing Adams to develop and implement a program to abate groundwater and surface water contamination emanating from the landfill. Adams timely appealed both orders and both appeals were consolidated on December 4, 1990.

The Department moved for summary judgment with respect to Adams' appeals. Both parties agreed, for purposes of the motion, that the contamination of the Strine water supply resulted from volatile organic contaminants emanating from the 78 acre portion of the landfill which ADSCO had used to dispose of waste prior to Adams' operation of the site. The Board, by order dated April 5, 1994, granted the Department partial summary judgment and required Adams to restore or replace the Strine water supply and to submit and implement a groundwater pol-

---

1. The Department was known as the Department of Environmental Resources when this action commenced. The Department has subsequently been renamed the Department of Environmental Protection.

lution abatement plan addressing the entire 108 acre site.[2]

■ In its appeal here,[3] Adams asserts that the Board erred in requiring it to replace the Strine water supply since it did not dispose of the waste which caused the harm to the Strine water supply. Adams also asserts that the Board erred in requiring it to submit and implement a ground water pollution abatement plan for the entire site.

The Board, in concluding that Adams was responsible for replacing the Shrine water supply, relied on Section 273.245(a) of the Department's regulations, 25 Pa.Code § 273.245(a), which provides, in relevant part, as follows:

A person or municipality operating a municipal waste landfill which affects a water supply by degradation, pollution or other means shall restore or replace the affected water supply with an alternate source that is of like quantity and quality to the original supply at no additional cost to the owner. . . .

On the basis of the foregoing Section, the Board concluded that because Adams, in February of 1984, began conducting solid waste landfill operations at the "Adsco Landfill," (see Pre-hearing stipulations, ¶ 5, ¶ 8; R.R. 29a) and that because there was no dispute that the "Adsco Landfill" polluted the Strine water supply, the Department had the authority to direct Adams to replace the Shrine water supply and abate the pollution.

Adams maintains that Section 273.245(a) of the regulations, 25 Pa.Code § 273.245(a), relied on by the Board, conflicts with Section 1104 of the Municipal Waste Planning, Recycling and Waste Reduction Act, Act of July 28, 1988, P.L. 556, as amended, 53 P.S. § 4000.1104, and that pursuant to the defenses provided in Section 1104(d), it cannot be found liable for the contamination of the Strine water supply. We disagree.

Section 1104(a) provides as follows:

(a) **Alternative water supply requirement.**—Any person owning or operating a municipal waste management facility that adversely affects a public or private water supply by pollution, degradation, diminution or other means shall restore the affected supply at no additional cost to the owner or replace the affected supply with an alternate source of water that is of like quantity and quality to the original supply at no additional cost to the owner. If any person shall fail to comply with this requirement, the department may issue such orders to the person as are necessary to assure compliance.

Subsection (d) of Section 1104, relied upon by Adams, relates to Subsection (c) of Section 1104. These Sections provide, in relevant part, as follows:

(c) **Rebuttable presumption.**—Unless rebutted by one of the four defenses established in subsection (d), it shall be presumed that the owner or operator of a municipal waste landfill is responsible for the pollution, degradation or diminution of a public or private water supply that is within one-quarter mile of the perimeter of the area where solid waste management operations have been carried out.

(d) **Defenses.**—In order to rebut the presumption of liability established in subsection (c), the owner or operator must affirmatively prove by clear and convincing evidence one of the following four defenses:

. . . . .

(4) The owner or operator did not cause the pollution, degradation or diminution.

Adams argues that the record demonstrates that it, as the owner/operator of the landfill, did not cause the pollution to the Strine water supply, since the undisputed facts demonstrate that the pollution came from that portion of the landfill which AD-SCO had filled prior to Adams leasing the

---

**2.** The Board denied summary judgment in part; however the subject of the denial is not herein relevant.

**3.** Our scope of review of Board decisions is limited to determining whether the Board committed constitutional violations, errors of law, or wheth-

er any necessary findings of fact made by the Board were unsupported by substantial evidence. *Willowbrook Mining Co. v. Department of Environmental Resources*, 92 Pa.Cmwlth. 163, 499 A.2d 2 (1985).

108 acres. By this assertion, Adams would have this court distinguish between the 30 acres of the site which Adams intended to fill, of which it filled 8.8 acres, and the remaining 78 acres which ADSCO filled prior to Adams leasing the entire 108 acres; this we cannot do.

While it is true that the parties have stipulated that the contamination of the Strine water supply originated from that portion of the landfill that was filled by ADSCO prior to Adams leasing the property, it is undisputed that Adams has been in control of, and the operator of, the entire 108 acre site since February of 1984. As such, Adams is responsible for any and all contamination emanating from the entire 108 acre site; not just contamination emanating from the 8.8 acres of the 30 acres it filled.

■ Based on the foregoing, we conclude that the Board properly upheld the Department's directive that Adams was responsible for replacing the Strine water supply. We now turn to the issue of whether the Board properly upheld the Department's order directing Adams to develop and implement a program to abate groundwater and surface water contamination emanating from the landfill.

The Board concluded, on the basis of Section 316 of the Clean Streams Law, Act of June 22, 1937, P.L.1987, art. III, *as amended*, 35 P.S. § 691.316, that Adams, as the lessee of land where pollution was emanating, was responsible for correcting the condition.

Section 316 provides, in relevant part, as follows:

Whenever the department finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the department may order the landowner or occupier to correct the condition in a manner satisfactory to the department or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action. For the purpose of this section, "landowner" includes any person holding title to or having a proprietary interest in either surface or subsurface rights . . .

■ Adams argues that pursuant to our holding in *Philadelphia Chewing Gum Corp. v. Department of Environmental Resources*, 35 Pa.Cmwlth. 443, 387 A.2d 142 (1978), *affirmed in part and appeal dismissed in part, sub nom. National Wood Preservers, Inc. v. Department of Environmental Resources*, 489 Pa. 221, 414 A.2d 37, *appeal dismissed*, 449 U.S. 803, 101 S.Ct. 47, 66 L.Ed.2d 7 (1980), the Department, in order to impose liability under Section 316, must demonstrate that the landowner/occupier knew or should have known of the existence or condition on the land and that the landowner/occupier associated itself with the condition after its creation.[4] Adams maintains that because the Department failed to make such a showing here, it improperly ordered Adams to develop and implement a program to abate groundwater and surface water contamination emanating from the landfill. We disagree. Contrary to Adams' assertion, the record reveals that these requirements were satisfied.

Specifically, as noted previously herein, Adams took over the entire 108 acre ADSCO landfill operation in February of 1984. Adams operation of the landfill was not limited to the 30 acres of the site which it intended to fill. To the contrary, Adams operated and maintained a leachate collection and treatment system which was installed by ADSCO on the 78 acre portion of the site it previously filled; Adams repaired holes in the liners of the three treatment lagoons which were part of the leachate system; and Adams submitted monthly discharge monitoring reports to the Department regarding the system. Moreover, Adams eliminated erosion gullies and performed revegetation

---

4. We note that Adams cites to our decision in *North Cambria Fuel v. Department of Environmental Resources*, 153 Pa.Cmwlth. 489, 621 A.2d 1155 (1993), *affirmed without opinion*, 538 Pa. 377, 648 A.2d 775 (1994), as requiring the Department to make the foregoing showing; however, we note that while we did discuss the holding of *Philadelphia Chewing Gum* in *North Cambria*, it was Section 315 of the Clean Streams Law, 35 P.S. § 691.315 that was at issue in that case. Here, only *Philadelphia Chewing Gum* is relevant.

work in the 78 acre portion of the site previously filled by ADSCO. (Pre-hearing stipulations, ¶¶ 18, 20, 22, 30, 31; R.R. 31–33a).

Given the foregoing undisputed facts, we conclude that Adams, as the operator of the entire 108 acre landfill operation, knew or should have known of the condition on the land, and that it positively associated itself with the condition after its creation as required by *Philadelphia Chewing Gum.* Accordingly, the Board correctly upheld the Department's order that Adams develop and implement a program to abate groundwater and surface water contamination emanating from the landfill and we will affirm the Board's order.

## *ORDER*

AND NOW, this 18th day of October, 1996, the order of the Environmental Hearing Board dated December 8, 1995 is affirmed.