530 A.2d 140

William J. McIntire Coal Co., Inc., et al., Petitioners *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued April 21, 1987, before Judges CRAIG and DOYLE, and Senior Judge BARBIERI, sitting as a panel of three.

*Gregg M. Rosen, Rosen & Mahfood,* for petitioners.

*Leo M. Stepanian,* for petitioners, William J. McIntire Coal Co., Inc., and William J. McIntire, individually.

*B. Patrick Costello, Costello & Berk,* for petitioner, Ronald G. McIntire Coal Co., Inc. and Ronald G. McIntire, individually.

*Diana J. Stares,* Assistant Counsel, for respondent.

OPINION BY SENIOR JUDGE BARBIERI, August 13, 1987:

William J. McIntire Coal Co., Inc., William J. McIntire, and Ronald G. McIntire (collectively McIntires), appeal a decision of the Environmental Hearing Board (Board) affirming an order of the Department of Environmental Resources (Department). The Department's order, dated July 29, 1983, directed the McIntires to permanently treat or abate acid mine drainage emanating from an area known as the Heilman Mine in Armstrong County, Pennsylvania. McIntires also appeal the Board's affirmance of its prior order on reconsideration.[1]

---

[1] The Board consolidated an appeal by R. G. McIntire Coal Co., Inc. from the Department's refusal to issue it 1983 and 1984 mining permits for another mining site with the appeal by the McIntires. The Department denied R. G. McIntire Coal Co., Inc., a 1983 and 1984 mining license pursuant to Section 3.1 of the

William J. McIntire Coal Co., Inc. operated a surface mining operation on land leased from Ray Heilman between 1975 or 1976 and 1979. William J. McIntire and Ronald G. McIntire are brothers and are the sole partners in M and M Coal Co. which subcontracted with William J. McIntire Coal Co., Inc., for the mining activities at the Heilman Mine site.

Prior to the issuance of William J. McIntire Coal Co., Inc.'s surface and mine drainage permits, a Department inspector conducted a pre-mining survey of the site. The inspector noted abandoned deep mines from a prior mining operation in an area known as the Heilman Ravine. In connection with the pre-mining survey the inspector took water samples of the discharge from the abandoned deep mines in the Heilman Ravine and a subsequent analysis indicated that the water was in violation of Department effluent limits, *i.e.* acid mine drainage.

On March 7, 1975, the Department issued a mining permit and a mine drainage permit to William J. McIntire Coal Co., Inc. for the Heilman Mine site, which included the Heilman Ravine where the acid mine discharges were located. The discharges which are

---

Surface Mining Conservation and Reclamation Act, the Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §1396.3a, because its President, Ronald G. McIntire failed to comply with the Department's order to treat or abate discharge at the Heilman Mine site.

The Department submits that R. G. McIntire Coal Co., Inc., is not a party to this proceeding as neither the Petition For Review nor the Petitioners' brief raises the issue of whether the licenses were improperly denied.

Pursuant to Pa. R.A.P. 908 we must deem R. G. McIntire Coal Co., Inc., a party to this proceeding. Furthermore, R. G. McIntire Coal Co., Inc., is an undeniably interested party as its license to mine rises or falls with the outcome of the appeal of the Department's order to treat or abate the discharges emanating from the Heilman site.

the subject of the Department's July 29, 1983, order are in the vicinity of the pre-existing deep mines. However, the McIntires backfilled the entire area with soil and the deep mine entries are thus no longer visible. The groundwater from the majority of the Heilman Mine site flows toward the Heilman Ravine where it discharges. The discharges form a small stream which flows into Garrett's Run, a tributary of the Allegheny River.

The McIntires appealed the Department's order to permanently treat or abate the acid mine discharges to the Board. The hearing examiner for the Board resigned prior to issuance of the July 7, 1986, adjudication. The Board affirmed the Department's order and held the McIntires liable for causing or allowing unauthorized discharges from the Heilman Mine in violation of Section 315 of the Clean Streams Law,[2] the Department effluent limitations as set forth at 25 Pa. Code §87.102 and various conditions contained in the mine drainage permit.

The Board affirmed its adjudication on reconsideration. On appeal to this Court[3] the McIntires contend that the Board committed an error of law in finding them liable under Section 315 of the Clean Streams Law for the discharges which they allege they did not cause or degrade and that they are entitled to a new hearing in light of the fact that the hearing examiner resigned prior to the issuance of the Board's adjudication.[4] We initially note that pursuant to Section 704 of

---

[2] Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.315.

[3] On November 6, 1986, this Court denied Petitioner's application for a supersedeas of the Board's order.

[4] The issue of entitlement to a new hearing is on appeal from the Board's Adjudication and Order dated July 7, 1986, and the Board's Opinion and Order Sur Petition For Reconsideration dated September 8, 1986.

the Administrative Agency Law, 2 Pa. C. S. §704, we must affirm the Board's adjudication unless the necessary findings are unsupported by substantial evidence, an error of law has been committed, or there has been a violation of constitutional rights. *Lucas v. Department of Environmental Resources*, 53 Pa. Commonwealth Ct. 598, 420 A.2d 1 (1980).

The pertinent provisions of Section 315(a) of the Clean Streams Law read as follows:

> (a)   No person or municipality shall operate a mine or allow a discharge from a mine into the waters of the Commonwealth unless such operation or discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department. . . . A discharge from a mine shall include a discharge which occurs after mining operations have ceased, provided that mining operations were conducted subsequent to January 1, 1966, under circumstances requiring a permit from the Sanitary Water Board under the provisions of Section 315(b) of this act as it existed under the amendatory act of August 23, 1965 . (P.L. 372, No. 194). The operation of any mine or the allowing of any discharge without a permit or contrary to the terms or conditions of a permit or contrary to the rules and regulations of the department is hereby declared to be a nuisance. . . .

In *Commonwealth v. Harmar Coal Company*, 452 Pa. 77, 306 A.2d 308 (1973), our Supreme Court upheld a denial by the Sanitary Water Board[5] of mine drainage

---

[5] The Sanitary Water Board was abolished by Section 30 of the Act of December 3, 1970, P.L. 834, 71 P.S. §510-103, and its functions transferred to the Department of Environmental Resources.

permits to Harmar Coal Company and Pittsburgh Coal Company which would approve the discharge of untreated acid mine drainage. The *Harmar* Court held that Section 315(a) of "the Clean Streams Law requires an operator of an active mine to treat the entire discharge from the active mine and a discharge from an adjacent inactive mine necessary to protect the active workings." *Id.* at 100, 306 A.2d at 321.

Our Supreme Court has also held that a mine operator is liable under both common law and statutory nuisance theories for post-mining discharges, which occurred as a natural result of the previous mining operations along with the volume and flow of surface and underground waters around the mine site. *Commonwealth v. Barnes and Tucker Company,* 455 Pa. 392, 319 A.2d 871 (1974) *(Barnes and Tucker I).* The Board held that *Harmar Coal* and *Barnes and Tucker I,* taken together, provide that a mine operator is liable for post-mining discharges in excess of permissible effluent limits regardless of the source of the discharge or whether they were caused by the operator.

The McIntires contend that Section 315(a) does not provide for strict liability upon a mine operator for post-mining discharges which it did not cause or degrade; however we need not specifically determine this question as, contrary to the McIntires' assertions, the Board's adjudication does assign them responsibility for causing the discharges. It is true that operator liability in both *Harmar Coal* and *Barnes and Tucker I* involved an element of causation. In *Harmar Coal* the acid mine discharge resulted from the operator's pumping of polluted water in an adjacent mine and in *Barnes and Tucker I,* although fugitive mine water was contributing to the discharge, the operator's mining activity was the "dominant and relevant fact without which the public nuisance would not have resulted where and under the

circumstances it did." *Commonwealth v. Barnes and Tucker Company,* 23 Pa. Commonwealth Ct. 496, 510, 353 A.2d 461, 479 (1976) *aff'd,* 472 Pa. 115, 371 A.2d 461 (1977), appeal dismissed, 434 U.S. 807 (1977), *(Barnes and Tucker II).*

Although the Board found that the pre-existing deep mine workings were likely to be the primary source of the acid mine drainage discharging into the Heilman Ravine, it also found that the McIntires increased the potential for the acid mine drainage by failing to abide by Special Condition Nine and Additional Special Condition One of the mine drainage permit. Together these required all deep mine workings that were encountered to be stripped out, leaving only a twenty-five foot wide strip of coal crop line.[6] Instead of leaving only a twenty-five foot wide strip of coal crop line the McIntires left a crop line barrier of between one-hundred and one-hundred and twenty-five feet.

The Board also found that an additional potential source of the acid mine drainage is the coal refuse which the McIntires placed in the pit. Standard Condition Twenty-nine and Additional Special Condition Two of the mine drainage permit provided that old refuse from the abandoned deep mining activities which was encountered was to be buried high in the surface mining pit in a specified manner. The McIntires failed to bury the refuse high in the pit as specified.

The Board found that the recharge area[7] for the Heilman Ravine discharge includes most of the area

---

[6] The crop line of the coal seam is where the coal is naturally exposed or covered with soil only. The crop line barrier is the portion of the mined coal seam which was left in place between the crop line and where the McIntires surface mined the coal. Findings of Fact 34 and 38 of the Board's Adjudication dated July 7, 1986.

[7] The recharge area is where the ground water system which supplies the discharge receives water from the surface. Finding of Fact No. 29 of the Board's Adjudication dated July 7, 1986.

surface mined by the McIntires. Although recognizing the fact that the McIntires offered expert testimony that the abandoned deep mines were a likely source of the acid mine drainage, the Board noted that these mines were located in the same seam of coal which the McIntires mined and that they had mined through significant portions of them during the surface mining operation.

A review of the record reveals that there is substantial evidence to support the Board's findings that the McIntires increased the potential for acid mine drainage to develop. A hydrogeologist with the Department's Bureau of Mining and Reclamation testified that he found highly significant differences when comparing pre-mining and post-mining water samples and that in his opinion the surface mining operation worsened the acid mine discharges.[8] He further stressed that analyses of water samples revealed post-mining acidity values which were greatly increased over the pre-mining samples.[9]

Section 315(a) of the Clean Streams Law does not require an operator to treat a discharge emanating from a mine site if the discharge is authorized by the Department's rules and regulations or if the operator has first obtained a permit. The McIntires contend that the pollutional discharges were authorized by the permit issued to William J. McIntire Coal Co., Inc., and former Section 77.92(26) of the Department's rules and regulations, 25 Pa. Code §77.92(26), rescinded July 30, 1983, 12 Pa. B. 2382. The McIntires failed to raise this argument before the Board and it is therefore not properly before this Court. Pa. R.A.P. 1551(a)(3). However, we note the McIntires' contention that their permit did not

---

[8] See Notes of Testimony from January 17, 1984, hearing before the Board (N.T.) at pages 194 and 219.

[9] N.T. at 193.

require that they treat existing discharges is directly contradicted by Special Condition Fifteen of the mine drainage permit which provided that all gravity drainages encountered from the previous deep mining operation should be treated to neutrality. Further, Standard Conditions Ten, Eleven and Twelve required that all discharges comply with certain effluent limitations. The discharges which are the subject of the Department's order are not in compliance with these conditions or the Department's regulations. Therefore the permit expressly imposes liability on the McIntires to treat the discharges.

The McIntires premise the argument that they are not responsible for treating or abating the discharges on the pre-mining survey which noted acid mine drainage from a prior deep mining operation. In presenting their contentions, they conveniently overlook the fact that they surface mined the area in question and violated several permit conditions which the Board found increased the potential for the development of acid mine drainage.

Section 3 of the Clean Streams Law, 35 P.S. §691.3, provides that the discharge of industrial waste "into the waters of the Commonwealth which causes or *contributes* to pollution as defined herein or creates a danger of such pollution is declared . . . to be a public nuisance." (Emphasis added.) Further, Section 601 of the Clean Streams Law, 35 P.S. §691.601 provides for the abatement of such public nuisances. A mine operator cannot escape liability for acts which further degrade water quality or cause additional pollution to the waters of this Commonwealth simply because a polluting condition existed from a prior operation.

The Department submits that Section 316 of the Clean Streams Law, 35 P.S. §691.316, provides an independent basis for holding the McIntires liable for treat-

ment or abatement of the discharge. Section 316 provides that "[w]henever the Department finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth [it] may order the landowner or occupier to correct the condition."

Section 316 imposes liability upon an owner or occupier of land for a polluting condition thereon even if the owner or occupier did not cause the condition. However, before liability will attach it must be shown that the owner or occupier knew of the polluting condition and positively associated with it by engaging in some affirmative conduct, indicating an intent to adopt the condition. *See National Wood Preservers v. Department of Environmental Resources*, 489 Pa. 221, 414 A.2d 37 (1980), (FLAHERTY, J., concurring), appeal dismissed, 449 U.S. 803 (1980). Under the facts of this case we would not hesitate to conclude that the McIntires positively associated with the previously existing polluting condition.

We see no merit in the McIntires' contention that they may not be held liable under Section 316 without the Board having specifically found that they were owners or occupiers of the Heilman Mine site as of July 29, 1983, the date of the Department's order. Although Section 316 does not specifically declare a "condition" resulting in pollution to be a public nuisance, we have held that public nuisance law applies to Section 316 when the "condition is the direct cause of a public nuisance." *Philadelphia Chewing Gum Corp. v. Department of Environmental Resources*, 35 Pa. Commonwealth Ct. 443, 458 n. 5, 387 A.2d 142, 149 (1978), *aff'd* 489 Pa. 221, 414 A.2d 37 (1980). Here the McIntires have caused a nuisance. The fact that the Department's order was issued after the nuisance was created is irrelevant. In any event, although the Board

made a passing reference to Section 316 of the Clean
Streams Law in its adjudication, it is clear that it based
its ruling on liability on Section 315(a).

We now turn to the McIntires' contention that they
are entitled to a new hearing. The record before the
Board was closed on September 6, 1984, and the former
Board member who presided over the hearings resigned
on January 31, 1986.[10] The Board's adjudication is dated
July 7, 1986. The pertinent regulation reads as follows:

§21.86 Conduct of Hearings

(a)  Hearings may be held, at the discretion of
the Board, before the Board as a whole, by indi-
vidual Board Members sitting as hearing ex-
aminers or by hearing examiners who are not
members of the Board. Hearings held by hear-
ing examiners not members of the Board will be
decided by the Board based upon its review of
the record and the examiner's proposed adjudi-
cation. *Final decisions shall be decisions of the
Board decided by majority vote.* Petitions for su-
persedeas and other petitions and motions may
be decided by the Board member hearing the
petition or motion.

25 Pa. Code §21.86(a) (emphasis added).

The McIntires argue that the Board's adjudication of
July 7, 1986, failed to comport with the regulation be-
cause the hearing examiner was not a current member
of the Board at the time the adjudication was rendered
and did not submit a proposed adjudication. We refuse
to read into the regulation a requirement that a Board
member sitting as a hearing examiner must be a cur-
rent member at the time of adjudication or must submit
a proposed adjudication. Both the hearing and adjudica-

---

[10] See Board's Opinion and Order Sur Petition For Recon-
sideration, dated September 8, 1986, at page 8.

tion in this matter were totally appropriate under the provisions of Section 21.86(a).

The regulation provides that all final decisions are to be decisions of the Board by majority vote. Clearly the submission of a proposed adjudication by a hearing examiner cannot be a determining factor as the final decision is made by the Board. Should the Board's adjudication differ from a proposed adjudication the latter would certainly be disregarded.

The McIntires argue further that since the Board's adjudication was not written by the hearing examiner they were denied due process of law. In support of this contention the McIntires stress the importance of the factfinder's credibility determinations. We have held that witness demeanor is not the only consideration in determining credibility and that due process does not require that administrative adjudicators be present at a hearing but only that they review the record in preparing their decisions. *Caldwell v. Clearfield County Children and Youth Services,* 83 Pa. Commonwealth Ct. 429, 300 A.2d 508 (1973). From the detailed citations to the testimony and exhibits in the Board's adjudication, it is obvious that the Board reviewed the record carefully. Therefore, the Board properly denied the McIntires a new hearing.

Having disposed of the McIntires' contentions in favor of the Board, we will affirm its orders.

## ORDER

AND NOW, this 13th day of August, 1987, the orders of the Environmental Hearing Board at Docket No. 83-180-M, dated July 7, 1986, and September 8, 1986, are affirmed.