Reid J. CAVANAUGH and June
E. Cavanaugh, his wife,

v.

FAYETTE COUNTY ZONING HEARING
BOARD, and Robert M. Stewart and
Lois J. Stewart, his wife.

Commonwealth Court of Pennsylvania.

Argued June 2, 1997.

Decided Sept. 10, 1997.

Mark D. Brooks, Connellsville, for appellants.

Ewing D. Newcomer, Uniontown, for appellee, Fayette County ZHB.

James S. Lederach, Scottdale, for appellees, Robert and Lois Stewart.

Before DOYLE and LEADBETTER, JJ., and JIULIANTE, Senior Judge.

DOYLE, Judge.

Reid J. Cavanaugh and June E. Cavanaugh appeal an order of the Court of Common Pleas of Fayette County, which affirmed an order of the Fayette County Zoning Hearing Board determining that an ordinance enacted by the Fayette County Commissioners, rezoning part of the Cavanaugh's property, constituted spot zoning and was null and void.

The Cavanaughs own thirty-three acres of land (the property) located in Bullskin Township and Upper Tyrone Township, Fayette County, Pennsylvania. The property was zoned A–1 AgriculturalRural,[1] and it is completely surrounded by other parcels zoned A–1 and R–2 Residential.[2] On April 21, 1992, the Cavanaughs petitioned the Commissioners to have a portion of the property rezoned to B–1 General Business.[3] The Commissioners conducted a hearing and then granted the Cavanaughs' request for rezoning. On January 13, 1993, the Commissioners adopted Ordinance 93–01, which amended Fayette County's zoning ordinance to rezone approximately twelve acres of the Cavanaughs' property from A–1 to B–1. After the Ordinance was enacted, the Cavanaughs' applied to the Fayette County Zoning Office for a zoning certificate to allow the Cavanaughs to use the property as a "truck shop."[4] The zoning certificate was granted on June 3, 1993.

The Cavanaughs immediately began to construct the truck shop on the property; however, on July, 1, 1993, Robert M. Stewart and Lois Stewart, neighboring property owners, joined by the Concerned Citizens of Pennsville, appealed from the issuance of the

---

1. The A–1 district is an open space district for productive land and land containing useful mineral deposits. Section 301.1 of the Zoning Ordinance of Fayette County (Zoning Ordinance). Uses permitted in the A–1 district include agriculture, forestry, mining, one and two family residences, limited professional uses, and residential beauty-barber shops. Section 400 of the Zoning Ordinance.

2. The R–2 district is intended for medium density residential development, including mobile homes. Section 301.2 of the Zoning Ordinance.

3. The B–1 General Business district is for retail and service establishments catering to residents and workers in the community. General business uses include supermarkets, drug stores, hardware stores, automotive sales, clothing stores, business and professional services, and offices. Sections 301.3 and 400 of the Zoning Ordinance.

4. The truck shop was a commercial trucking facility. The Cavanaughs intended to construct an 8,200 square foot metal pole building to serve as a garage for eight construction trucks and twenty-five or more tractor trailers and other heavy trucks. The facility was to employ more than thirty-three persons.

Cavanaugh's zoning certificate to the Fayette County Zoning Hearing Board (ZHB). After a hearing, the ZHB determined that the Commissioners' rezoning of the property constituted spot zoning, and held that Ordinance 93–01 and the zoning certificate were null and void. The Cavanaughs appealed to the Common Pleas Court, which remanded the case for additional testimony on the question of spot zoning. Additional hearings were conducted and the ZHB issued a second decision holding that Ordinance 93–01 constituted spot zoning. The second decision was appealed by the Cavanaughs to the Common Pleas Court, which affirmed the ZHB.

The Cavanaughs appealed the Common Pleas Court's decision to this Court. We determined that the ZHB had not made sufficient findings of fact on the question of whether the property was distinguishable from the surrounding land and had not resolved conflicts in the evidence or made credibility determinations. Accordingly, we vacated the order of the Common Pleas Court and remanded the case for additional proceedings. *Cavanaugh v. Fayette County Zoning Hearing Board*, 663 A.2d 901 (Pa. Cmwlth.1995).

The Common Pleas Court remanded the case to the ZHB for further proceedings. However, the ZHB was now comprised of three new members, none of whom were involved in any of the prior hearings in this matter. The ZHB, using the existing record, made new findings of fact and credibility determinations, and issued a decision finding, as the ZHB had found before, that the rezoning of the property by Ordinance 93–01 was spot zoning.

The Cavanaughs again appealed the ZHB's decision to the Common Pleas Court, raising, *inter alia,* the issue of whether the ZHB, comprised of new members who had never heard the witnesses' testify, could make findings and credibility determinations based on the existing record only. The Common Pleas Court held that the ZHB could make credibility determinations on the existing record, even if none of the members of the ZHB actually observed the witnesses. The Court further held that the findings adopted by the ZHB properly resolved the merits of the case. This appeal followed.

On appeal, the Cavanaughs contend that (1) the ZHB committed a manifest abuse of discretion by not conducting new hearings to determine the credibility of witnesses and the weight of the evidence, since none of the members heard the testimony in this matter, and (2) the record does not support the ZHB's conclusion that Ordinance 93–01 constituted spot zoning.

■ The Cavanaughs challenge the new ZHB's ability to make credibility determinations or make findings as to the weight of the evidence based solely on the cold record. They assert that members of the ZHB had to actually see and hear the witnesses testify in order to perform their fact-finding function.

■ While a fact finder's observation of the demeanor of a witness has traditionally been viewed as an important factor in determining credibility,[5] administrative adjudi-

---

5. Current psychological research casts doubt on the traditional view that observation is critical to determining the credibility of witnesses. Consider the following:

[Psychological] [r]esearch indicates that most people do a poor job of using demeanor evidence to determine whether a declarant is lying or telling the truth. Like the judge reversed for advising a jury ... that wiping hands while testifying is 'almost always an indication of lying,' most people seem to view as signs of lying a number of behaviors that are not actual cues to deceit. But these behavior patterns often *are* signs of nervousness, and therefore present among truthful witnesses nervous about testifying in court. . . .

Worse yet, this research indicates also that people commonly credit behaviors that are in fact indicia of lying—making eye contact, smil-

ing less, and gesturing more—as signs of honesty. Indeed, one group of researchers went so far as to suggest that 'the more a behavior was associated with [actual] deception, the less it was associated with perceived deception.' Hence, while demeanor evidence may cause people to doubt the truthful witness, it may also cause them to believe the liar.

. . . .

Perhaps the most telling result of this psychological research is the shared conclusion of all researchers that people are generally not very good at separating lying from truth-telling. Most report that people are not much better than chance in detecting lies. If that is accurate, there seems to be little compelling reason to favor adjudication methods that stress live testimony.

cators are permitted to determine the credibility of testimony from the reading of a transcript. *Caldwell v. Clearfield County Children & Youth Services,* 83 Pa.Cmwlth. 49, 476 A.2d 996 (1984). Administrative agencies often use a system of adjudication where a hearing examiner or presiding officer takes evidence and the ultimate fact finder is a board or commission, which has the power to make findings of fact based solely on a review of the record. *See, e.g., Kramer v. Department of Insurance,* 654 A.2d 203 (Pa.Cmwlth.1995) (presiding officer conducted an evidentiary hearing, but the adjudication was issued by the Insurance Commissioner); *Pennsylvania State Police v. Pennsylvania Human Relations Commission,* 127 Pa.Cmwlth. 436, 561 A.2d 1320 (1989) (hearing panel's decision was advisory only and the Commission is the ultimate fact finder with the power to substitute its findings for that of its hearing officers); *William J. McIntire Coal Co. v. Department of Environmental Resources,* 108 Pa. Cmwlth. 443, 530 A.2d 140 (1987) (where one Environmental Hearing Board member served as a hearing examiner, but the final adjudication was made by the Board as a whole based on its review of the record), *petition for allowance of appeal denied,* 518 Pa. 614, 540 A.2d 536 (1988). An adjudicative method where the ultimate decision in a case is made by an administrative fact finder who did not hear the testimony does not deny a litigant due process of law. *Kramer; McIntire.*

In *Peak v. Unemployment Compensation Board of Review,* 509 Pa. 267, 501 A.2d 1383 (1985), our Supreme Court held that the Unemployment Compensation Board of Review could reassess a referee's credibility determinations, even though it did not hear the witnesses' testimony. Most important, the *Peak* Court rejected the very argument raised by the Cavanaughs in this appeal—that credibility determinations depend on the observation of witnesses during the hearing—reasoning as follows:

> At bottom, appellant's proposition that the referee should have the exclusive power to resolve credibility issues is based on the notion that credibility evaluations depend on the observation of live witnesses while they testify. Such observation is often important, but is not the only factor to be considered in deciding who is to evaluate credibility on conflicting evidence. Considerations of expertise, uniformity of decision and control over policy are also relevant. Besides, a rule embodying that proposition would preclude a fact finder from weighing depositions against live evidence, or documents or exhibits against live testimony, a practice common and necessary to administrative and judicial factfinding. We decline to adopt such a rule.

*Peak,* 509 Pa. at 279, 501 A.2d at 1389–90.

Similarly, in *Biagini v. Workmen's Compensation Appeal Board (Merit Contracting Co.),* 158 Pa.Cmwlth. 648, 632 A.2d 956 (1993), *petition for allowance of appeal denied,* 537 Pa. 667, 644 A.2d 1203 (1994), we were presented with an argument that a workers' compensation claimant's due process rights were violated when his case was decided by a different referee than the one who presided at the hearings. The claimant asserted that the referee who actually heard the evidence had a greater opportunity to assess the credibility of evidence, than the referee who rendered the decision. We rejected that argument based on the reasoning in *Peak.*

While no appellate court has applied the above principles in a zoning matter, the issue was considered by the Court of Common Pleas of Philadelphia County in *Fleishon v. Zoning Board of Adjustment (No. 2),* 14 Pa. D. & C. 2d 348 (1958). In *Fleishon,* a newly appointed member of the zoning board voted in favor of granting certain variances, even though he did not attend the hearings in the case. The appellant challenged the propriety of the new member's vote on the ground that he had not heard the evidence. The court rejected that argument, reasoning as follows:

> The basis on which a member casts his vote is not limited to testimony heard from live witnesses. At the executive session

Richard L. Marcus, *Completing Equity's Conquest? Reflections on the Future of Trial Under the Federal Rules of Civil Procedure,* 50 U. Pitt. L.Rev. 725, 758–60 (1989) (emphasis in original) (footnotes omitted).

when the vote is cast, the board members have before them the application for the permit in question, all photographs and exhibits produced at the hearing, the report of the board's inspector as to the nature of the premises and the neighborhood involved, and his own seasoned knowledge of zoning law. The application sets forth the use applied for, the dimensions of any structure, the zoning designation of the property and is accompanied by a plot plan of the proposed development.... All of these matters are sufficient to inform any member of the board, not present at the hearing, so that his vote is an intelligent vote on the record....

*Fleishon,* 14 Pa. D. & C. 2d at 353–54.

Moreover, the Pennsylvania Municipalities Planning Code (Code), Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202, provides further support for the view that the zoning hearing board can make findings of fact based solely on the record. Section 908(2) of the Code, 53 P.S. § 10908(2), allows the zoning hearing board to use a hearing officer to conduct hearings, and pertinently provides as follows:

> The hearings shall be conducted by the board **or the board may appoint any member as a hearing officer.** The decision, or, where no decision is called for, the findings shall be made by the board.... (Emphasis added.)

This procedure allows the zoning board to make a decision based on a record created at a hearing before a single member of the board. Further, when a common pleas court reviews a zoning hearing board decision and discovers that necessary findings of fact are missing, under Section 1005–A of the Code,[6] 53 P.S. § 11005–A, the court can make its own findings on the existing record, even if it does not receive additional evidence.

Therefore, regardless of the fact that the ZHB was composed of new members who

never participated in the hearings in this matter and never observed any witness testify, we hold that the ZHB did not err in making findings of fact and credibility determinations based on the record only. There is no reason to treat a zoning hearing board differently than other administrative tribunals permitted to make credibility determinations on a cold record, and allowing board members to make findings in such a manner is consistent with hearing procedure in Section 908(2) of the Code. Moreover, following *Peak,* we must conclude that, while the observation of a witness's demeanor may be valuable, it is not indispensable to a fact finder's ability to make a credibility determination.[7] Accordingly, we believe that the extensive record in this matter was a sufficient basis for the ZHB members to find facts and determine the credibility of witnesses. *Peak; Fleishon.*

■ Turning now to the merits, the Cavanaughs contend that the ZHB erred in declaring Ordinance 93–01 and their zoning certificate void because of spot zoning. Spot zoning is an unreasonable or arbitrary classification of a small parcel of land, dissected or set apart from surrounding properties, with no reasonable basis for the differential zoning. *Cleaver v. Board of Adjustment,* 414 Pa. 367, 200 A.2d 408 (1964). When a zoning amendment is challenged based upon an assertion that it constitutes spot zoning, the amendment is presumed to be valid and, to overcome that presumption, the amendments must be shown to be arbitrary and unreasonable, unrelated to the public health, morals, safety or general welfare of the community. *Schubach v. Silver,* 461 Pa. 366, 336 A.2d 328 (1975); Robert M. Anderson, *Law of Zoning in Pennsylvania* § 5.12 (1982).

In the present case, the ZHB's holding that Ordinance 93–01 constituted spot zoning was based on the following salient findings of fact: (1) the property, which was rezoned by

6. Section 1005–A was added to the Code by Section 101 of the Act of December 21, 1998, P.L. 1329.

7. We note that four expert witnesses testified at the hearings in this matter. In our view, when determining the credibility of an expert's testimony, the critical factors are logic, unequivocality, reasonableness of the conclusion, and the degree that the witness's view deviates from the general opinion of other experts. The expert's demeanor is not as significant a factor in determining his or her credibility as it might be in the case of another type of witness.

the Commissioners to B–1, is completely surrounded by parcels zoned either A–1 or R–2; (2) prior to the rezoning, the property consisted of open, undeveloped rural land of a residential character, even though it was at one time used for mining; (3) the portion of the property cleared by the Cavanaughs was smooth and covered by vegetation that enhanced the residential character of the neighborhood; (4) the portion of the property the Cavanaughs cleared was indistinguishable from nearby residential properties; (5) prior deep and surface mining on the property did not distinguish it from other surrounding land, did not present a hazard, and did not preclude the properties from being used in accord with the uses in the A–1 and R–2 zones; (6) the Fayette County Comprehensive Plan projects a future residential use for the property, and not a commercial use; (7) Ordinance 93–01 was enacted solely to benefit the Cavanaughs; and (8) Ordinance 93–01 bears no reasonable relationship to health, safety, morals, and general welfare of the Community.

■ The Cavanaughs' challenge to the ZHB's decision is premised on their claim that the property is distinguishable from surrounding parcels, because, as a result of prior mining activity, the land is plagued by sinkholes and pitholes which render the property unsuitable for residential development or agriculture.[8] They initially raise two related arguments: (1) the ZHB's finding that the property is indistinguishable from surrounding properties is unsupported by substantial evidence; and (2), since the property is distinguishable from neighboring land, Ordinance 93–01 does not constitute spot zoning. We must disagree.

The ZHB found that much of the property was deep mined and strip mined for coal. The deep mining occurred approximately 100 years ago, and strip mining ceased on the property approximately 40–50 years ago. The strip mined portions of the property have been restored and the property is covered by trees and other vegetation. A photograph of the Cavanaughs' property, taken from an aircraft, was admitted into evidence. (Stewart's Exhibit 3.) The photograph shows that, with the exception of the land being excavated for the truck shop, the property contains wooded areas and green fields, and is free of obvious scars caused by strip mining. The trees and fields extend for miles, and one of the fields shown in the photograph, located very close to the site being developed, appears to be cultivated.

Although there is evidence that sinkholes and pitholes are present on the property, with regard to the twelve acres of the property that was rezoned, there is testimony that that portion of the land was relatively smooth, without such holes, or other indicia of mining. Even if that portion of the property contained pitholes and sinkholes, those defects were not so severe or hazardous as to preclude the Cavanaughs from constructing an 8,200 square foot commercial building intended for the storage of more than thirty heavy construction vehicles and tractor-trailer trucks. Reid Cavanaugh testified that he constructed his truck shop building on land that was sturdy and free of pitholes; while he filled in some pitholes near the building, he planned to park heavy vehicles over the filled holes. (N.T., 3–24–94, at 100–01.) The ZHB found as fact that the Cavanaughs were able to prepare the property and erect the building without employing any special construction or reclamation techniques.

In addition, the record does not indicate that mining was confined to the Cavanaugh's property, or that pitholes and sinkholes are unique to the property. The Cavanaughs note that certain residential properties located in a R–2 zone near their property are distinguishable from the rezoned area, because they have never been mined and are, thus, free of pitholes and sinkholes. But, there is evidence in the record showing that the Cavanaugh's property is suitable for residential development regardless of the fact that it was mined. Russel B. Mechling, Jr., an engineer who testified on behalf of the Stewarts, opined that the property could be utilized for residential development, in par-

---

8. Sinkholes and pitholes are depressions in the ground caused by the removal of coal. (Notes of Testimony, 4–28–94, at 116.)

ticular mobile homes, as well as agriculture. The ZHB found that past mining on the property did not preclude its use as permitted in the A–1 zone and the R–2 zone.

Therefore, based on all the above, we conclude that the ZHB's finding that the Cavanaughs' property was not distinguishable from surrounding properties is supported by substantial evidence. The property is, thus, not so unique as to justify the Commissioners' decision to change the zoning classification of the twelve acres of the property at issue from A–1 to B–1.

■ The Cavanaughs argue, however, that the rezoning of the property is consistent with Fayette County's Comprehensive Plan and community development objectives, because the use of the property for a truck shop will rehabilitate the land. The ZHB found that the Comprehensive Plan establishes a policy to "create living areas and business and industrial districts free of incompatible uses" and to avoid "haphazard development." (Finding of Fact No. 20.) Further, the Comprehensive Plan classified the property as within an area designated for future residential use. Contrary to the Comprehensive Plan, however, Ordinance 93–01 mixes incompatible commercial and non-commercial uses and frustrates the future residential designation of the area surrounding the property. Therefore, the Commissioners decision to create a B–1 zone on the property was inconsistent with the objectives of Fayette County Comprehensive Plan.

■ Last, the Cavanaughs argue that the Stewarts did not sustain their burden of proving that Ordinance 93–01 was arbitrary and unreasonable, with no relationship to the public health, morals, or general welfare of the community. Again, we must disagree.

Ordinance 93–01 created a commercial district on the Cavanaugh's property in the midst of agricultural and residential uses. The ZHB determined that the area was residential in character and that the truck shop would be detrimental to nearby residential uses. Contrary to the Cavanaugh's view, the fact that their property was mined at one time is not sufficient to distinguish it from surrounding properties and justify the spe-

cial treatment afforded by the Commissioners. The ZHB found that the Commissioners decision to enact Ordinance 93–01 was not based on a planning process that considered the mined character of the property, but was enacted solely to benefit the Cavanaughs. Furthermore, the B–1 zone created by the Commissioners is at odds with the Fayette County Comprehensive Plan, which projects future residential development in the area that was rezoned and discourages the blending of incompatible commercial and residential uses. Therefore, based on all of the above, because Ordinance 93–01 created, without any justification, a commercially zoned island surrounded by incompatible uses, we conclude that the Stewarts met their burden of proof that Ordinance 93–01 was unreasonable and unrelated to general health, morals, and welfare of the community.

Accordingly, the Common Pleas Court's order is affirmed.

### ORDER

**NOW,** September 10, 1997, the order of the Court of Common Pleas of Fayette County in the above-captioned matter is hereby affirmed.